## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## (SOUTHERN DIVISION)

PABLO PALACIO,

      Plaintiff                                 Mag. Judge Ellen S. Carmody

v                                                    Case No. 1:16-cv-00169

WOODLAND TURF SPORTS
CENTER, INC., a Michigan Corporation,
and DUANE D. VANDER ARK, an individual,

      Defendants.

---

Marc Asch (P75499)                   Steven J. Vander Ark (P32471)
Counsel for Plaintiff               Counsel for Defendants
137 N. Park St., Ste. 201B          29 Pearl Street N.W., Ste. 145
Kalamazoo, MI  49007             Grand Rapids, MI  49503
(617) 653-8184                     (616) 454-6500
marc.a.asch@gmail.com         steve.vanderark@gmail.com

Robert Anthony Alvarez (P66954)
Counsel for Plaintiff
Avanti Law Group. PLLC
600 28th Street SW
Wyoming, MI 49509
(616) 257-6807
ralvarez@avantilaw.com

---

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

## ORAL ARGUMENT REQUESTED

## <u>TABLE OF CONTENTS</u>

Index of Authorities ........................................................................................................ i

Introduction ...................................................................................................................... 1

Procedural Setting ............................................................................................................ 2

Statement of Facts ............................................................................................................ 2

Argument ........................................................................................................................ 10

      Standard of Review ........................................................................................... 10

     I.     Plaintiff's Complaint was not filed within the FLSA's General Two Year
          Statute of Limitations ........................................................................... 11

     II.    Defendants' Alleged Violation of the FLSA was not Willful or Reckless
          and a three year Statute of Limitations Should Not be Applied ........... 12

     III.   Plaintiff's Request for Equitable Tolling of the Statute of Limitations
          is Without Merit ................................................................................... 22

     IV.   Woodland is not an Enterprise Under the FLSA and Neither Woodland
          Nor Plaintiff was Engaged in Interstate Commerce ............................ 30

     V.    Plaintiff has failed to State or Support a Claim of Retaliation Under
          the FLSA .............................................................................................. 40

     VI.   Depending on the Court's Ruling on Other Issues Plaintiff's State Law
          Claims Should be Dismissed With or Without Prejudice ..................... 44

Conclusion ...................................................................................................................... 45

# INDEX OF AUTHORITIES

## Case Law

*#10 East 40th Street Building v. Callus*, 325 U.S. 578 (1845) ....................................................40

*Andrews v. DuBois*, 888 F.Supp. 213, 220 n.9 (D. Mass 1995) ...................................................14

*Andrews v. Orr*, 851 F.2d 146, 151 (6th Cir. 1988) ........................................................................24

*Arlington v. Michigan Bell Telephone Co.*, 746 F.Supp.2d 854, 857-859 (E.D. Mich. 2010) .....44

*Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004)........................................................................23

*Baldwin County v. Welcome Center*, 466 U.S. 147, 151 (1984) ...................................................28

*Baden-Winterwood v. Life Time Fitness*, 484 F.Supp.2d 822, 829 (S.D. Ohio, 2007) ................29

*Brown v. Cassens Transportation Co.*, 546 F.3d 347, 363 (6th Cir. 2008) ..................................44

*Campbell v. Grand Trunk Western R. Co.*, 38 F.3d 772, 775 (6th Cir. 2005) ..............................11

*Collado v. Florida Cleanex, Inc.*, 727 F.Supp.2d 1369, 1374 (2010) ..........................................36

*Daroski v. Wojewoda*, No. 3:15-cv-00803, 2016 WL 4178840 (D.C. Conn. Aug. 7, 2016) ........37

*Dowd v. Blackstone Cleaners, Inc.*, 306 F.Supp. 1276, 1281 (N.D. Tex. 1969) .........................14

*Dunlap v. Industrial America Corporation*, 516 F.2d 498, 499 (5th Cir. 1975) ..........................36

*Epps-Milton v. Genesee Intermediate School Dist.*, 2014 WL 5817015 No. 14-11861 (E.D. Mich., Nov. 10, 2014)........................................................................................................................27

*Graham-Humphreys v. Memphis Brooks Museum of Art*, 209 F.3d 552 (6th Cir. 2000)...............28

*Habich v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir. 2003) ...................................................44

*Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946) .......................................................................23

*Hughes v. Regan VII Area Agency on Aging*, 542 F.3d 169, 187 (6th Cir. 2008) ........................11

*Hunter v. Madison Ave. Corp.*, 174 F.2d 164, 167 (6th Cir. 1949) ....................................32, 39, 40

*Jacoby v. Schimka Auto Wreckers, Inc.*, No. 10-C-1452, 2010 WL 3171515 (N.D. Ill. Aug. 11, 2010) ...................................................................................................36

*Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14, (2011) ............................41

*Kowalski v. Kowalski Heat Treating Co.*, 920 F.Supp. 799, 802 – 803 (N.D. Ohio 1996) ....30, 31

*McLeod v. Threlkeld*, 319 U.S. 491, 497 (1943) ........................................................32

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)...........................................12, 13, 22

*Matysiak v. Shamas*, No. 3:10-cv-01841, 2015 WL 4939793 (D.C. Conn.,  2015) ....................29

*Mireless v. Frio Foods, Inc.*, 889 F.2d 1407, 1416 (5th Cir. 1990) ...............................14

*Mitchell v. Welcome Wagon, Inc.*, 139 F.Supp. 674, 678 (W.D. Tenn. 1954) ...........................32

*Morrison v. Staples, Inc.*, No. 08-616, 2008 WL 4911156, at *3 (D. Conn. Nov. 13, 2008) .......45

*Opre v. Milton Township Bd. of Trustees*, No. 04:07-cv-1493, 2007 WL 4350709 (N.D. Ohio, Dec. 7, 2007) .................................................................................28

*Pacheco v. Boar's Head Provisions Co. Inc.*, No. 09-398, 2010 WL 1323785, at *3 – 4 (W.D. Mich. March 30, 2010) .......................................................................44

*Penley v. NPC International, Inc.*, 206 F.Supp.3d 1341, 1349 (W.D. Tenn. 2016) ....................24

*Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1080 (1st Cir. 1995) ........................14

*Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991) (per curium) ...........................................28, 29

*Schneider v. City of Springfield*, 102 F.Supp.2d 827 (S.D. Ohio 1999) .......................................13

*Shaver v. Brimfield Twp.*, 628 F.App'x 378, 384 (6th Cir. 2015) .................................44

*Shoemaker v. Lake Arbutus Pavilion, LLC*, 115 F.Supp.3d 974 (W.D. WI 2015) .................37, 39

*Smith v. Erie County Sheriff's Dept.*, 603 F.3d 414, 424 (6th Cir. 2015) .......................44

*Solano v. Alli Baba Mediterranean Grill, Inc.*, No. 3:15-cv-055-G, 2016 WL 808815 (N.D. Tex. 2016) .................................................................................14

*Thorne v. All Restoration Services, Inc.*, 448 F.3d 1264, 1266 (11th Cir. 2006) .............32, 33, 36

*Transworld Airlines, Inc., v. Thurston*, 469 U.S. 111, 125-30 (1985) ..........................................13

*Truitt v. County of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998) ......................................................23

*United States v. $57,960.00 in U.S. Currency*, 58 F.Supp.2d 660, 664 (D.S.C. 1999) ...............23

*United States v. Baker*, 197 F.3d 211, 218 (6th Cir. 1999) ...........................................................29

*Wallace v. Kato*, 549 U.S. 384, 396 (2007) ...................................................................................30

*Walling v. Sanders*, 136 F.2d 78 (6th Cir. 1943) .........................................................................33

*Wycihowski v. Clariant Medical Plan*, No: 1:15-cv-1233, 2017 WL 1154221 (W.D. Mich. March 28, 2017) .........................................................................................................................................10

## **Statutes**

28 U.S.C. §1331 .............................................................................................................................44

28 U.S.C. §1367 .............................................................................................................................44

28 U.S.C. §1367(c)(3) .....................................................................................................................44

29 U.S.C. §201 .................................................................................................................................1

29 U.S.C. §203(b) ...........................................................................................................................32

29 U.S.C. §203(i) ............................................................................................................................34

29 U.S.C. §203(s)(1)(A) .................................................................................................................31

29 U.S.C. §207(1) ...........................................................................................................................30

29 U.S.C. §215(a)(3) .......................................................................................................................40

29 U.S.C. §255(a) ...........................................................................................................................11

M.C.L. §408.411 ...............................................................................................................................1

M.C.L. 408.414(a) ..........................................................................................................................44

M.C.L. 408.420(1)(a) ......................................................................................................................44

M.C.L. §423.501 ...............................................................................................................................1

**Regulations**

29 C.F.R. §779.251 ....................................................................................................34

29 C.F.R. § 779.116 ...................................................................................................39

**Rules**

Fed. R. Civ. P. 56(a) ...............................................................................................1, 10

Fed. R. Civ. P. 12(b)(6)...............................................................................................12

**Miscellaneous**

Black's Law Dictionary (8th Ed. 2004) .......................................................................28

## INTRODUCTION

In this case, Plaintiff Pablo Palacio ("Palacio") alleges that the Defendant Woodland Turf Sports Center, Inc., ("Woodland") and its owner, Duane D. Vander Ark, failed to pay him overtime and engaged in retaliation under the Fair Labor Standards Act. 29 U.S.C. §201. *et. seq.* ("FLSA"). Plaintiff also alleges State law violations under the Michigan Workforce Opportunity Wage Act, M.C.L. §408.411, *et. seq.*, for failure to pay overtime and the Michigan Bullard-Plawecki Employee Right to Know Act, M.C.L. §423.501 *et. seq.* for failure to provide Plaintiff's personnel file.

Between 2006 and 2016, Woodland was in the business of renting time on two indoor soccer fields at leased facilities located in Grand Rapids, Michigan. Time was rented to local sports clubs, leagues, high schools and colleges, principally between October and March each year. Mr. Palacio provided general maintenance work for Woodland between August 2006 and February 2009 and again from October 2011 to April 2013. Woodland contends that Mr. Palacio was an independent contractor contrary to Plaintiff's position that he was an employee.[1]

Woodland seeks summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure as follows:

1. Plaintiff's original Complaint under the FLSA was not filed within two years of the accrual of Plaintiff's claim for overtime compensation as required by the general statute of limitations of the FLSA.

2. Plaintiff cannot support by material facts a triable issue on Plaintiff's claim that Woodland willfully or recklessly violated the FLSA, thus extending the statute of limitations to three years.

---

[1] Plaintiff will ultimately have the burden of proving he was an employee covered by the FLSA and not an independent contractor. Defendants are not seeking summary judgment pursuant to Fed. R. Civ. P. 56(a) on this issue. Still, the facts supporting Defendants' position that Mr. Palacio was an independent contractor are relevant to Plaintiff's claim that Woodland's failure to pay overtime compensation was a willful violation of the FLSA, thus extending the general two year statute of limitations to three years under the FLSA.

3. Plaintiff cannot support by material facts his burden to demonstrate that the doctrine of equitable tolling of the FLSA statute of limitation should be applied in this case.

4. There is no material issue of fact on Plaintiff's claim that Woodland was an "enterprise" as defined in the FLSA entitling Plaintiff to coverage by the statute.

5. Plaintiff cannot support by material facts his burden to demonstrate that he is entitled to "individual" coverage of the FLSA by regularly engaging in interstate commerce while working for Woodland.

6. In the alternative, Plaintiff cannot support with material facts his claim that Woodland retaliated against him in any tangible work related way as a result of claims he made that Woodland violated the FLSA.

7. If Plaintiff's federal claims are dismissed, Defendants request that the Court exercise its discretion in refusing supplemental jurisdiction of state law claims and that they be dismissed without prejudice.  Should the Court not dismiss Plaintiff's federal claims, Defendants claims under Michigan Workforce Opportunity Wage Act must be dismissed based upon statutory exemption.

## PROCEDURAL SETTING

Plaintiff's Complaint was filed on February 17, 2016 (Dkt. 1).  An Amended Complaint was filed on May 4, 2016 (Dkt. 14).  Discovery closed on March 3, 2017, with trial scheduled to begin November 27, 2017 (Case Management Order, Dkt. 23, Page ID. 97).[2]

## STATEMENT OF FACTS

**A. Woodland Turf Sports Center, Inc.**

**1.    Incorporation and Facility Renovation.**  Woodland was incorporated in March 2006.  Defendant Duane Vander Ark is the sole shareholder, officer, and director.  (Ex. B, Vander Ark dep. p. 7, lines 1 – 2)[3].  Mr. Vander Ark is the owner of several other closely held corporations operating principally in the mortgage industry.  (Ex. B, Vander Ark dep. p. 9, lines 8 – 15).  Mr. Gordon Dean was an employee of one of Mr. Vander Ark's mortgage companies

---

[2] The Court granted Woodland's Motion with Concurrence for Leave to File Excess Pages exceeding the page limitations for dispositive motions and replies.  (Dkt. 39).

[3] Defendants' counsel is Duane Vander Ark's Uncle.

and suggested a local need for an indoor soccer facility which could be rented by the hour principally during the winter months.  (Ex. C, Dean dep. p. 5, lines 8 – 25; p. 6, lines 1 – 4).  Mr. Dean located a space to rent which could house two indoor soccer fields as part of a building adjoining Woodland Roller Rink located at 2100 28th Street SE in Grand Rapids, Michigan.  The building was owned by the Roedvoets family who ran the roller rink portion of the building.  (Ex. B, Vander Ark dep. p. 12, lines 12 – 19).   The Roodvoets family had leased the approximately 70,000 sq. ft. space for various uses over time.   Woodland was formed and negotiated a lease with the Roodvoets family in July 2006.  Extensive renovation of the space was required.   After deconstruction (prior use as an indoor flea market), artificial turf was purchased and installed creating two indoor soccer fields.   The renovation was sufficiently complete to begin rental in late 2006.

2.     **Business Operations.**   Woodland's business was rental by the hour of two artificial turf sports fields.  (Ex. B, Vander Ark dep. p. 11, lines 5 – 10; Ex. C, Dean dep. p. 6, lines 5 – 10).  After renovation in 2006, Woodland remained in business until April 2016, when its lease with the Roodvoets family was not renewed, and the entire complex was sold.  (Ex. B, Vander Ark dep. p. 12, lines 22 – 25).

Gordon Dean was the manager of Woodland.  (Ex. C, Dean dep. p. 7, line 1).  Woodland hired him as an independent contractor/manager for the facility.  Having been involved in youth soccer for many years, Mr. Dean set-up winter youth and adult soccer leagues which would rent and use the facility.  As word spread of the availability of indoor sports fields, local schools and sport enthusiasts began renting the facility.  In addition to practice and games by soccer clubs and local schools, the fields were used for lacrosse, football, rugby, track and field, cricket, ultimate Frisbee, and flying radio controlled model airplanes.  (Ex. C, Dean dep. p. 34, lines 12 –

25; p. 45, lines 22 – 25; p. 46, lines 4 – 24; p. 59, lines 14 – 25; p. 60, lines 1 – 10).  Woodland also donated time for local law enforcement training, special events raising money for charity and practice time for local high school football teams.  (Ex. C, Dean dep. p. 35, lines 1 – 4; p. 60, lines 1 – 6).  Since the business of Woodland was renting time, Woodland would occasionally rent the facility to Hispanic groups for quinceañeras (Ex. C, Dean dep. p. 46, lines 21 – 25) and for religious purposes, such as Muslim groups celebrating the beginning and end of Ramadan. (Ex. C, Dean dep. p. 47, lines 1 – 5).

The facility was rented to local colleges, including Calvin College, Aquinas College, Cornerstone and Davenport (Ex. C, Dean dep. p. 46, lines 4 – 24).  Local high schools rented the facility, including East Grand Rapids, Grand Rapids Christian and South Christian.  (Ex. C, Dean dep. p. 60, lines 13 – 17).  Over the ten years Woodland was in business, no teams or educational institutions from outside the State of Michigan ever rented the facilities. (Ex. C, Dean dep. p. 76, lines 12 – 22).

The artificial turf was purchased from and installed by a company located in Illinois. (Ex. C, Dean dep. p. 72, lines 8 – 13).  Tools and materials necessary for maintenance were all purchased from local retail stores.  (Ex. C, Dean dep. p. 67, lines 18 – 23).  Supplies such as cleaning materials, toilet paper, etc…, were purchased at local stores such as Gordon Foods or Costco.  (Ex. C, Dean dep. p. 66, lines 22 – 25; p. 67, lines 1 – 5).  Woodland did not provide soccer balls, uniforms, or related sports equipment as part of its rental business. (Ex. C, Dean dep. p. 60, lines 23 – 25; p. 61, lines 1 – 2).  Woodland acquired soccer and lacrosse goals locally.  (Ex. C, Dean dep. p. 68, lines 9 – 25; p. 58, lines 14 – 25; p. 60, lines 1 – 22).

For a short period of time, Woodland had snack and drink vending machines obtained from a local distributor and one put in place by Mr. Dean's son.  (Ex. C, Dean dep. p. 29, lines 3

4

– 20). On occasion, candy and snacks purchased locally were available for purchase from the counter. (Ex. C, Dean dep. p. 29, lines 17 – 25; p. 30, lines 1 – 8). The facility had a kitchen. Mr. Dean and other independent contractors, including Mr. Palacio, were allowed to use the kitchen to prepare and sell food such as hot dogs and keep any proceeds or profits. (Ex. C, Dean dep. p. 26, lines 2 – 25; p. 27, lines 1 – 4; p. 30, lines 12 – 25; p. 31, lines 1 – 17). None of these efforts were successful. For a brief period of time, Mr. Dean agreed with a friend who was closing down a sporting goods store, to have available behind the counter approximately 30 pairs of tennis shoes for patrons who may have forgotten theirs. If sold, the proceeds were divided between Mr. Dean personally and his friend. (Ex. C, Dean dep. p. 31, lines 20 – 25; p. 32, lines 1 – 25). Woodland never provided catered food to any event. (Ex. C, Dean dep. p. 76, lines 7 – 11). They did allow individuals to sell homemade tacos during some of the Hispanic soccer league games. (Ex. C, Dean dep. p. 27, lines 9 – 24).

Attached as Ex. D, are profit and loss statements for Woodland for calendar years 2006 through 2016. Woodland never had gross revenue of $500,000 or more in any calendar year. (Ex. E, Kozak Aff. p. 2, ¶4). Other than incidental and vending machine income from 2008 to 2010, field rental income comprised 99.3% of Woodland's gross revenue. (Ex. E, Kozak Aff. p. 2, ¶5)

**3.      Seasonal Business.**  Not surprisingly, indoor sports fields would principally be used from fall to early spring in Michigan. Peak season for Woodland was October through March. An analysis of Woodland's monthly gross field rental revenue for calendar years 2007 – 2013, reveals that 88% of Woodland's gross revenue was received during these peak season months. (Ex. E, Kozak Aff. p. 2, ¶7). Woodland did not have advertised or regular business

hours – the sign on Woodland's only entrance reflected that hours varied by season. (Ex. C, Dean dep. p. 74, lines 4 – 8).

4. **Personnel.** Woodland was an "anomaly to a traditional style of business." (Ex. B, Vander Ark dep. p. 65, lines 8 – 24). Gordon Dean managed the day-to-day operations as an independent contractor. (Ex. C, Dean dep. p. 4, lines 21 – 24). Mr. Dean was solely responsible for "hiring and firing" and arranging for personnel as needed. (Ex. Dean dep. p. 18, lines 23 – 25). Maintenance and janitorial services were performed by Mr. Palacio during the two time periods he worked for Woodland. Between these time periods (approximately 30 months) Woodland hired a cleaning service for janitorial needs. Mr. Palacio signed independent contractor agreements (Ex. G and Ex. H), as did all independent contractors. (Ex. B, Vander Ark dep. p. 63, lines 9 – 25; p. 64, lines 1 – 8). Over the course of ten years, Woodland retained in excess of 100 independent contractors, the vast majority of which were referees. (Ex. C, Dean dep. p. 39, lines 2 – 15). During the peak season, every soccer and lacrosse game needed referees. Individuals were hired by Woodland and paid on a flat rate, per game basis. (Ex. C, Dean dep. p. 39, lines 16 – 17). Mr. Vander Ark testified that he did not believe it was "fair" to hire individuals as employees when the work was seasonal, the hours irregular and the jobs sporadic. (Ex. B, Vander Ark dep. p. 65, lines 8 – 24).

B. **Plaintiff Pablo Palacio.**

1. **Personal.** Pablo Palacio was born March 16, 1973, in Havana, Cuba where he graduated from high school. (Ex. F, Palacio dep. p. 8, lines 16 – 22)[4]. Following high school he took classes in construction and cooking. (Ex. F, Palacio dep. p. 8, lines 16 – 22). Mr. Palacio cultivated land, sold fruit and worked for construction companies. (Ex. F, Palacio dep. p. 10,

[4] Mr. Palacio's deposition was taken on January 24, 2016. Plaintiff's counsel advised that an interpreter would be necessary. Defendants' counsel retained the services of Mr. Henry Camargo, who is certified by the Michigan Supreme Court, State Court Administrator's Office as a Certified Spanish Court Interpreter.

6

lines 15 – 25; p. 11, lines 1 – 2).  He came to the United States in 2003 and immediately moved to Michigan.  He has since resided in the Grand Rapids area.  (Ex. F, Palacio dep. p. 12, lines 6 – 12).  Although never married, he has two adult children, Gilberto and Guillermo.  (Ex. F, Palacio dep. p. 7, lines 13 – 25).

  **2.**   **Employment History.**   Upon arrival in Grand Rapids in 2003, Mr. Palacio worked for Venta Furniture for approximately one year doing upholstery.  (Ex. F, Palacio dep. p. 12, lines 14 – 23).  He then worked for Grand Rapids Chair for approximately one year.  (Ex. F, Palacio dep. p. 13, lines 9 – 18).  Both jobs paid minimum wage and overtime.  (Ex. F, Palacio dep. p. 13, lines 1 – 8 and 19 – 24).  After working at Grand Rapids chair, he had short stints in the construction industry, some of which were as an independent contractor.  (Ex. F, Palacio dep. p. 15, lines 1 – 9).

  He began working at Woodland on August 6, 2006.  He signed an independent contractor agreement and was paid $8.00 per hour.  (Ex. G).[5]  When Mr. Palacio started, Woodland was in the process of remodeling the facility to create the indoor soccer fields.  Mr. Palacio was described by Gordon Dean as a "hard worker" with skills in general maintenance including plumbing, electrical and construction.   (Ex. C, Dean dep. p. 23, lines 8 – 21).   After the remodeling was complete, it was mutually agreed that Mr. Palacio would stay on at Woodland as an independent contractor doing maintenance.  *Id.*  Sometime in 2007, his hourly rate was increased to $10.00 per hour.  (Ex. C, Dean dep. p. 21, lines 5 – 16).  He worked for Woodland until February 7, 2009.

  After leaving Woodland in February, Mr. Palacio obtained employment in June 2009, doing maintenance for KMG Properties, an apartment management service.  (Ex. F, Palacio dep.

---

[5]  Mr. Palacio testified that in 2006 he had difficulty reading English.  Before signing the August 6, 2006, independent contractor agreement, Mr. Palacio testified that he had the help of two individuals "explaining" or "translating" the agreement.  (Ex. F, Palacio dep. p. 35, lines 2 – 25).

p. 18, lines 10 – 17).  He was an employee and was paid overtime for work over 40 hours per week.  (Ex. F, Palacio dep. p. 18, lines 18 – 21).  He worked for KMG until May 2011, when he was terminated for failing two drug tests.  (Ex. F, Palacio dep. p. 22, lines 1 – 7).

After he was terminated by KMG, he worked at Staffing Solutions doing temporary work (Ex. F, Palacio dep. p. 23, lines 10 – 21) and "by the job" cleaning at an auto shop (Ex. F, Palacio dep. p. 23, lines 22 – 25; p. 24, lines 12 – 19).

Mr. Palacio contacted Gordon Dean and requested to return to work at Woodland.  (Ex. C, Dean dep. p. 23, lines 23 – 25; p. 24, lines 1 – 10).  Mr. Dean agreed, and Mr. Palacio signed an independent contractor agreement dated October 17, 2011, at an hourly rate of $11.00 per hour.  (Ex. H).  He worked for Woodland until April 28, 2013.  After leaving Woodland, Mr. Palacio worked at Rivertown Construction doing drywall finishing and for a short period of time at West Haven Construction.  (Ex. F, Palacio dep. p. 30, lines 8 – 22; p. 32, lines 1 – 10).  At the time of his deposition in January 2016, Mr. Palacio was unemployed (Ex. F, Palacio dep. p. 29, lines 2 – 6), but was receiving Social Security Disability for mental health issues which benefits began in 2011. (Ex. F, Palacio dep. p. 76, lines 22 – 25; p. 77, lines 1 – 13).

**3.**      **Woodland Duties and Responsibilities.**  After the renovation, Mr. Palacio's job was general maintenance and janitorial work.  On an as needed basis, his job duties included:

1. Taking care of floors, including sweeping, mopping and painting;
2. Moving furniture and equipment;
3. Repairing and installing drywall, painting, picking up trash, sweeping and running a golf cart;
4. Repairing field lights and nets;
5. Outdoor building maintenance such as picking up trash, sweeping and snow removal;
6. Cleaning glass windows and doors;
7. Removing and installing carpeting, hanging doors and other general maintenance work; and,
8. Cleaning bathrooms.

(Ex. F, Palacio dep. p. 61, lines 23 – 25; p. 62, lines 1 – 25; p. 63, lines 7 – 10).

On rare occasions, he was asked to talk on the telephone with Spanish speaking customers (Ex. F, Palacio dep. p. 63, lines 16 – 25), collected rental fees when alone at the facility (Ex. F, Palacio dep. p. 64, lines 11 – 19), scheduled rental time, and sold miscellaneous items to customers.  (Ex. F, Palacio dep. p. 65, lines 12 – 22).  He never traveled out-of-state for Woodland and had no responsibility for opening mail, ordering supplies, or paying invoices. (Ex. F, Palacio dep. p. 64, lines 2 – 3 and 20 – 22).

Mr. Palacio testified that there was "flexibility" in his hours during the off-season, but were more regular during peak season.  (Ex. F, Palacio dep. p. 43, lines 1 – 11).  He completed his own time sheets and was paid weekly.  (Ex. F, Palacio dep. p. 37, lines 6 – 17).  During the peak season, his maintenance duties were generally routine, but he would be assigned special projects involving maintenance or repair.  (Ex. C, Dean dep. p. 62, lines 4 – 18).  He provided his own tools but also used tools provided by Woodland.  (Ex. F, Palacio dep. p. 67, lines 12 – 19).

**4.**     **Claims.**   Between 2006 and the filing of this lawsuit, Mr. Palacio filed the following claims:

a.   Unemployment against Woodland (2009), which was denied.  (Ex. F, Palacio dep. p. 58, lines 13 – 18);

b.   Unemployment against KMG (2011), which was denied.  (Ex. F, Palacio dep. p. 22, lines 8 – 12);

c.   Civil rights complaint against KMG with the Michigan Department of Civil Rights (2009), which was settled.  (Ex. F, Palacio dep. p. 19, lines 15 – 25; p. 20, lines 1 – 8);

d.   Worker's compensation claim against KMG (2010).  (Ex. F, Palacio dep. p. 21, lines 8 – 11);

e.   Civil rights complaint against Woodland with the Michigan Dept. of Civil Rights (April 2013), which was dismissed.  (Ex. F, Palacio dep. p. 84, lines 16 – 25; p. 85 lines 12 – 25; p. 86, lines 1 – 3; Ex. I and Ex. J).

9

## **ARGUMENT**

### **Standard of Review**

The standard of review for a motion filed pursuant to Fed. R. Civ. P. 56(a) was accurately

stated by this Court in *Wycihowski v. Clariant Medical Plan*, No: 1:15-cv-1233, 2017 WL

1154221 (W.D. Mich. March 28, 2017), wherein this Court stated:

> Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the moving party demonstrates that "there is an absence of evidence to support the non-moving party's case," the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006).

> While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006).

> Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility considerations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and ... may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

> While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561

(6th Cir. 2002). Where the moving party has the burden, the plaintiff on a claim for relief or the defendant on an affirmative defense, "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." _Calderone v. United States_, 799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." _Arnett_, 281 F.3d at 561. Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." _Hunt v. Cromartie_, 526 U.S. 541, 553 (1999).

_Id._ *1 – 2.

## I.   PLAINTIFF'S COMPLAINT WAS NOT FILED WITHIN THE FLSA'S GENERAL TWO YEAR STATUTE OF LIMITATIONS.

An action to recover unpaid overtime compensation under the FLSA must be initiated "within two years after the cause of action accrued" unless the cause of action arose "out of a willful violation," in which case the cause of action must be commenced "within three years after the cause of action accrued." _Hughes v. Regan VII Area Agency on Aging_, 542 F.3d 169, 187 (6th Cir. 2008) (quoting, 29 U.S.C. §255(a)).  The Defendants have the burden to show that the two year statute of limitations has run.  _Campbell v. Grand Trunk Western R. Co._, 38 F.3d 772, 775 (6th Cir. 2005).

A cause of action for unpaid overtime accrues "at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed."  _Hughes_, 542 F.3d at 187.  Plaintiff performed work for Woodland from August 6, 2006 to February 7, 2009 and again from October 24, 2011, to April 28, 2013.  Mr. Palacio was paid weekly based upon time sheets he prepared and submitted.  The

last paycheck Mr. Palacio received from Woodland is dated May 3, 2013, for the pay period ending April 28, 2013.  (Ex. K).

Plaintiff's initial Complaint was filed February 17, 2016, (Dkt. 1) more than two years after accrual of his claim (May 3, 2013).  Consequently, Defendants are entitled to summary judgment on Plaintiff's federal claims.

## II. DEFENDANTS' ALLEGED VIOLATION OF THE FLSA WAS NOT WILLFUL OR RECKLESS AND A THREE-YEAR STATUTE OF LIMITATIONS SHOULD NOT BE APPLIED.

Plaintiff alleges in his First Amended Complaint that the Defendants failure to pay overtime was a "willful" violation of the FLSA.  (Ex. A, First Amended Complaint)[6] The Plaintiff has the burden of proving a willful violation to extend the FLSA statute of limitations from two to three years.  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1667, 100 L.Ed.2d 115 (1988).

The Supreme Court has observed that although Congress' decision to impose a three year statute of limitations for willful violations of the FLSA was enacted "for reasons that are not explained in the legislative history," the fact that "Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw a **significant distinction** between ordinary violations and willful violations."  *Id.* at 132 (emphasis added).

---

[6] Plaintiff's original Complaint (Dkt. 1) simply alleged a willful violation without pleading any supporting facts. Defendants filed a Request for a Pre-Motion Conference reflecting an intention to file for dismissal under Fed. R. Civ. P. 12(b)(6) based in part on the statute of limitations (Dkt. 6).  Judge Neff granted Plaintiff additional time to amend his Complaint to allege facts, if any, supporting an alleged willful violation.  Plaintiff filed his First Amended Complaint on May 4, 2016 (Dkt. 14).  Defendants withdrew their request to file dismissal and summary judgment motions in this regard (Dkt. 16) and discovery commenced.

The *McLaughlin* Court further held that "[t]o obtain the benefit of a three-year exception, the Secretary must prove that the employer's conduct was willful as that term is defined in [*Transworld Airlines, Inc., v. Thurston*, 469 U.S. 111, 125-30, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)]." The willful standard adopted in *Transworld,* requires the Plaintiff to show "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute…" *Transworld*, 469 U.S. at 133.

Knowledge by an employer that its actions "possibly might" violate the FLSA or whenever an employer realizes that the FLSA is "in the picture" is not sufficient. This argument was made by the plaintiff in *Schneider v. City of Springfield*, 102 F.Supp.2d 827 (S.D. Ohio 1999), where the Court stated:

> The Court finds the Plaintiff's argument absolutely meritless. *In McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), the United States Supreme Court expressly rejected the "willfulness" standard advanced by the Plaintiff. In so doing, the Court identified by name and explicitly rejected *Bennan v. Heard*, 491 F.2d 1 (5th Cir. 1974), and *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir. 1971), both of which the Plaintiff urges the Court to follow in the present case.

> The *McLaughlin* Court recognized that the "Jiffy June standard of willfulness - a standard that merely requires that an employer knew that the FLSA 'was in the picture' – virtually obliterates the distinction between willful and nonwillful violations." McLaughlin, 486 U.S. at 132 – 133, 108 S.Ct. 1677; see also Transworld Airlines, Inc., v Thurston, 469 U.S. 111, 128; 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (noting that "it would be virtually impossible for an employer to show that he was unaware of the Act and its potential applicability").

> \*\*\*

> **This standard [knew or showed reckless disregard] requires more than a showing of negligence on the employers part. *Id.* Even if an employer acts unreasonably, but not recklessly, in determining its legal obligation under the FLSA, its conduct does not satisfy the "willfulness" standard. *Id.* at n.13, 108 S.Ct. 1677.**

*Id.* at 836 (emphasis added). For a violation to be "willful" the violation "must be shown to be deliberate, voluntary and intentional as distinguished from one committed through inadvertences, accident or by ordinary negligence." *Dowd v. Blackstone Cleaners, Inc.*, 306 F.Supp. 1276, 1281 (N.D. Tex. 1969). The employer's state of mind or awareness of the law is irrelevant to the question of its willfulness. *Andrews v. DuBois*, 888 F.Supp. 213, 220 n.9 (D. Mass 1995); see also *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1080 (1st Cir. 1995) (holding that evidence that employer was aware of Act's requirements does not prove that the employer acted willfully); *Mireless v. Frio Foods, Inc.*, 889 F.2d 1407, 1416 (5th Cir. 1990) (no reckless disregard was present where employer discussed the Act with state officials and reviewed brochures and pamphlets).

Courts have found that evidence of certain conduct by an employer may create an inference of a willful violation. This conduct was recently summarized in the case of *Solano v. Alli Baba Mediterranean Grill, Inc.*, No. 3:15-cv-055-G, 2016 WL 808815 (N.D. Tex. 2016).

> Courts have found the following evidence sufficient to support an inference of willfulness: "(1) admissions that an employer knew its method of payment violated the FLSA prior to the accrual of the action; "*Bingham,* 2013 WL 1312563, at *14 (citing *Singer v. City of Waco,* 324 F.3d 813, 821-22 (5th Cir. 2003), *cert. denied,* 540 U.S. 1177 (2004)), "(2) continuation of a pay practice without further investigation after being put on notice that the practice violated the FLSA;" *id.* (citing *Reich v. Bay, Inc.,* 23 F.3d 110, 117 (5th Cir. 1994)), "(3) earlier violations of the FLSA that would put the employer on actual notice of the [r]equirements of the FLSA;" *id.* (citing *Chao v. A-One Medical Services,* 346 F.3d 908, 919 (9th Cir. 2003), *cert. denied,* 541 U.S. 1030 (2004); *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 967 (6th Cir. 1991); *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1062 (2d Cir. 1988); *Sealey v. Emcare, Inc.,* No. 2:11-CV-00120, 2013 WL 164040, at *2-4 (S.D. Tex. Jan. 14, 2013)), "(4) failure to keep accurate or complete records of employment;" *id.* (citing *Elwell v. University Hospitals Home Care Services*, 276 F.3d 832, 844 (6th Cir. 2002)), and "(5) prior internal investigations which revealed similar violations." *Id.* (citing *Reich v. Monfort, Inc.,* 144 F.3d 1329, 1334-35 (10th Cir. 1998)). However, a negligent violation of the FLSA does not constitute a willful violation, even if the employer's interpretation of the FLSA is unreasonable. *Mireles v. Frio Foods, Inc.,* 899 F.2d 1407, 1416 (5th Cir. 1990). Furthermore, "[s]imply failing to seek

14

legal advice concerning [one's] pay practice" does not constitute a willful violation. *Id.*

*Id.* at *11 – 12.

### A. There is No Evidence that Woodland Engaged in Any Conduct which Would Create a Triable Issue on a Willful Violation.

#### 1. Admission that Method of Payment Violated the FLSA.

There is certainly no admission by Woodland that its use of independent contractors, including the Plaintiff, was a violation of the FLSA. While this motion does not seek summary judgment on the issue of whether Plaintiff was an independent contractor or an employee, the significant facts supporting Woodland's decision in this regard are relevant to its good faith in making this determination. These facts include the following:

a. The seasonal and non-traditional style of Woodland's business supports the use of independent contractors for janitorial/maintenance work. (Ex. Vander Ark dep. p. 65, lines 8 – 24).

b. Mr. Palacio signed independent contractor agreements. (Ex. G and Ex. H).

c. Mr. Palacio set his own work schedule, including days and hours. (Ex. F, Palacio dep. p. 43, lines 1 – 11; Ex. B, Vander Ark dep. p. 65, lines 18 – 24; p. 66, lines 14 – 18; Ex. C, Dean dep. p. 77, pages 9 – 14).

d. Mr. Palacio utilized his own tools. (Ex. F, Palacio dep. p. 67, lines 12 – 19).

e. Mr. Palacio filled out and submitted his own time records. (Ex. F, Palacio dep. p. 37, lines 6 – 17).

f. The number of hours was determined based upon particular maintenance jobs as required. (Ex. C, Dean dep. p. 62, lines 4 – 18).

g.  On occasion, Mr. Palacio hired or brought with him other individuals to perform tasks. (Ex. C, Dean dep. p. 77,  lines 18 – 22).

h.  While working at Woodland, Mr. Palacio advertised his services to others. (Ex. C, Dean dep. p.77, lines 23 – 25, p. 78, lines 1 – 8).

i.  Mr. Palacio held meetings at Woodland to engage in a side business of selling specialty coffee. (Ex. F, Palacio dep. p. 75, lines 7 – 17).

j.  Mr. Palacio was provided with a key to the building to work on his own schedule. (Ex. C, Dean dep. p. 15, lines 1 – 5).

k.  Mr. Palacio's work hours were flexible.  (Ex. F, Palacio dep. p. 43, lines 1 – 11)

l.  Woodland provided 1099's to independent contractors, including Mr. Palacio. (Ex. E Kozak Aff. ¶8).

There is no question that Duane Vander Ark, owner of Woodland, was aware of FLSA overtime requirements by virtue of owning other businesses and having employees subject to the FLSA.  (Ex. B, Vander Ark dep. p. 24, lines 11 – 14).  Mr. Vander Ark testified:

Q.  Based upon the business of Woodland and how it was operated, did you honestly believe that using independent contractors for maintenance was appropriate?
A.  Yes.

(Ex. B, Vander Ark dep. p. 76, lines 11 – 15).

While triable issues may remain on whether Plaintiff was an employee or independent contractor, the factual support for Plaintiff's position in this regard does not create a triable issue with regard to willful or reckless conduct by Woodland.

## 2. Continuation of Pay Practice Without Further Investigation After Being Put on Notice that the Practice Violated the FLSA.

The source of "notice" that a pay practice violated the FLSA could come from a formal complaint by an employee. It may also result from a notice of investigation or a formal complaint by a unit of government. While working for Woodland, Mr. Palacio never filed a formal complaint regarding a violation of the FLSA. In fact, at one point in his deposition he testified that he did not even make an informal complaint:

> Q. After you began work at Woodland in August of 2006, did you complain to anyone at Woodland about not being paid overtime?
> A. No.

Ex. F, Palacio dep. p. 42, lines 13 – 16[7].

There has never been an investigation or formal complaint made against Woodland or any business owned or controlled by Duane Vander Ark. Mr. Vander Ark testified:

> Q. Mr. Vander Ark, has any governmental agency or department ever conducted a formal investigation of Woodland or any businesses owned by you for violations of any federal or state payment of wages law?
> A. No.
> Q. Has any governmental agency or department ever filed a formal complaint against Woodland or any businesses owned by you alleging violation of any federal or state payment of wages law?
> ***
> A. No.
> Q. Prior to the filing of this lawsuit, has any individual filed a lawsuit against Woodland or any business owned by you alleging violations of any state or federal payment of wages law?
> A. No.

(Ex. B, Vander Ark dep. p. 75, lines 16 - 24; p. 76, lines 6 – 10).

---

[7] Mr. Palacio's deposition testimony is unclear at times with regard to what he "complained" about and when. According to Mr. Palacio and Gordon Dean, Mr. Palacio regularly complained when he was "docked" any time on his weekly time sheets for time he was not physically present at Woodland. (Ex. C, Dean dep. p. 15, lines 16 – 25; p. 16, lines 1 – 2). When specifically asked about "overtime" complaints, he testified as set forth above that he did not complain about overtime or only complained when it was time to do his taxes. (Ex. F, Palacio dep. p. 44, lines 6 – 12).

17

### 3. Earlier Violations of the FLSA that Would Put Employer on Actual Notice of the Requirements.

There has never been a formal investigation of or a complaint filed involving Woodland or any business owned by Mr. Vander Ark.  *Id.*

### 4. Failure to Keep Accurate or Complete Records of Employment.

Woodland has maintained extensive records of Mr. Palacio's work.  In response to Plaintiff's Request for Production of Documents, hundreds of documents were provided or made available regarding Mr. Palacio's work.  By way of example, attached as Ex. L is a copy of Mr. Palacio's first time sheet in August 2006.  Attached as Ex. K is Mr. Palacio's last paycheck in May 2013.  Woodland has supplied to Plaintiff a summary of amounts paid to Mr. Palacio during relevant time periods.  Records of 1099's issued to Mr. Palacio have been maintained and provided to Plaintiff's counsel.  (Ex. H, Kozak Aff. p 2, ¶8).[8]

Maintaining extensive records of Mr. Palacio's work at Woodland is conduct which supports Woodland's position that any alleged violation was not willful or reckless.

### 5. Prior Internal Investigations which Reveal Similar Violations.

Woodland has never received a complaint from any individual or unit of government which would have prompted any internal investigations.  (Ex. B, Vander Ark dep. p. 75, lines 16 – 25; p. 76, lines 1 – 10).

### B. Allegations in Plaintiff's Amended Complaint.

The allegations contained in Plaintiff's First Amended Complaint under the heading "Willful Violation of FLSA" are contained in paragraphs 35 – 47 (Ex. A, pp. 5 – 6).  The

---

[8] For a period of time handwritten time sheets of independent contractors, including Mr. Palacio were physically sent to the individual responsible for issuing checks for Woodland as the amount of the check would be determined from review of the time sheets.  This procedure changed and Mr. Dean would collect the time sheets, enter the time on a spreadsheet which was then forwarded to Woodland.  After the checks were issued and Mr. Dean was not notified by an independent contractor that an amount was in error, the handwritten sheets were destroyed.  (See, Ex. C, Dean dep. p. 86, lines 1 – 6).

specific factual allegations and/or categories of factual allegations in this regard are set forth below with Defendant's response.

### 1. Independent Contractor.

Paragraph 35 – 39 and paragraph 45. a. of Plaintiff's Amended Complaint simply allege that Woodland's classification of Mr. Palacio as an independent contractor rather than an employee is evidence of a willful or reckless violation of the FLSA.  (Ex. A, pp. 5 – 6). Significant evidence exists supporting Woodland's classification of Mr. Palacio and others at Woodland.  Whether Plaintiff can sustain at trial his burden of proving that he was an employee and not an independent contractor is not, in and of itself, any evidence of willful or reckless conduct.  Based upon all the surrounding facts and circumstances, Woodland acted in good faith in paying Mr. Palacio as an independent contractor.

### 2. Failure to Post Notice of FLSA's Minimum Wage Provisions.

When Mr. Palacio began work at Woodland, there **was** posted in the break room the employee notice of overtime and minimum wage requirements. (Ex. C, Dean dep. p. 57, lines 17 – 25, and p. 58, lines 1 – 13).

### 3. Payment for All Hours Worked.

Mr. Palacio completed his own time sheets reflecting days and hours worked. (Ex. F, Palacio dep. p. 37, lines 6 – 7).  Unfortunately, Mr. Palacio also wrote down time when he was not on the premises working, such as lunch breaks and other absences.  (Ex. C, Dean dep. p. 79, lines 10 – 23).  The hours he submitted for payment were, at times, reduced to reflect time when he was actually working as would be the case for any independent contractor.  Any changes were discussed and explained to Mr. Palacio **each time** they occurred.  These were on-going problems

with Mr. Palacio falsifying his time sheets.  (Ex. C, Dean dep. p. 79, lines 5 – 23).  Gordon Dean

testified:

> Q.  You talked about docking his pay sometimes because you were under the
>      belief that he had not worked certain hours.  Did he ever disagree with you in
>      regards to that?
> A.  Yes.
> Q.  How many times did he voice disagreement?
> A.  I would say that whenever I reduced his pay that he was paid, he came and
>      said something about it.
> Q.  What would he say?
> A.  Why am I not getting paid for this time.
> Q.  Did he say that he was working during those hours?
> A.  No.  When I would tell him why he was not being paid, he would say, why
>      does that matter and I would say because you're not working.
> Q.  Did he ever tell you that he did work those hours?
> A.  Not for the hours that he was docked, no.
> Q.  Were there hours that he worked that were not reflected in his time sheets?
> A.  Never.
> Q.  How are you certain about that?
> A.  Because he would fill in his time sheets and I would pay them.

(Ex. C, Dean dep. p. 55, lines 21 – 25; p.56, lines 1 – 16).

These allegations are not only false, they have no relevance to the issue of whether any

alleged failure to pay overtime was willful or reckless.

**4.   Other Factual Allegations.**

Defendants' response to other factual allegations of willful conduct, include the

following:

> a.  *Paragraph 41:  Plaintiff approached Defendants after his first pay period regarding
>      the failure of Defendants to compensate the Plaintiff for overtime.* (Ex. A, p. 6, ¶41).

Mr. Palacio testified:

> Q.  I have had marked as Exhibit 11 a copy of your first amended complaint filed
>      in this lawsuit. Would you turn to page six, paragraph 41? I'm going to read
>      this. Plaintiff approached defendants after his first pay period regarding the
>      failure of the defendants to compensate the plaintiff for overtime. **Did you
>      approach someone at Woodland after your first pay period and complain
>      about not being compensated for overtime?**

**A. No.**

(Ex. F, Palacio dep. p. 42, lines 3 – 12) (emphasis added).

> b. *Paragraph 45. b.:  Defendant Vander Ark threatened Plaintiff with potential issues regarding his Social Security benefits should it be discovered that he was working more than 40 hours per week.*  (Ex. A, p. 6, ¶45. b.).

Mr. Palacio never had a substantive conversation with Mr. Vander Ark (Ex. F, Palacio

dep. p. 51, lines 12 – 17).  Even assuming this alleged conversation occurred with Mr. Dean, Mr.

Palacio testified:

> Q. Did Gordon Dean ever threaten to call Social Security and report to them that you were making more than the amount allowed?
> A. **No, that never happened** because he never pay me more than what the limit was. That was not an issue.
>
> ***
>
> A. Well, when I complained about issues like the number of hours I should be paid for or my overtime payment his reply often times was that I was receiving a check from the Social Security Administration, so.
> Q. And you took from that statement that that was a reason why he would not pay you for all the hours you were working?
> A. **No**, I think the reason why he didn't pay me for the overtime or the number of hours that I worked was because he knew I was on this disability program and he was aware that I did not remember things. And many times he manipulated me. I think he used the fact that I didn't have a good memory…

(Ex. F, Palacio dep. p. 84, lines 1 – 5; p. 81, lines 18 – 25; p. 82, lines 1 – 5) (emphasis added).

> c. *Paragraph 45. d.:  Defendant Vander Ark at one point told Plaintiff that he was withholding the pay for those hours worked in excess of 40 hours in order to be able to pay Plaintiff a steady stream of income during the slow periods of the year.* (Ex. A, p. 7, ¶45. d.).

Mr. Palacio never had a substantive conversation with Mr. Vander Ark (Ex. F, Palacio

dep. p. 51, lines 12 – 17).  Mr. Palacio testified that Gordon Dean may have told him this, but

also testified:

> Q. Did this ever happen, in other words, were you ever given a check for hours you didn't work in a week to make up for hours you worked before?

A. **No, that never happened.** The only times when he paid me for more than I had worked was those few times when I worked -- I'm sorry, when I paid for something that he asked me to buy for Woodland. Like if I would go and buy some tools or other things for Woodland, then he would pay me that back and that would be reflected in, in a check that I received.

(Ex. F, Palacio dep. p. 53, lines 22 – 25; p. 54, lines 1 – 6) (emphasis added).

Plaintiff's principal factual allegation supporting his claim of willful and reckless disregard of the FLSA is his basic contention that Duane Vander Ark, owner of Woodland, misclassified him as an independent contractor rather than an employee. As set forth above, there is significant factual support for this classification. Even if this decision rose to the level of negligence – it was not willful or reckless. Disputed conversations regarding Social Security Disability do not rise to the level of material issues of fact regarding willful or reckless conduct. Plaintiff simply cannot support what Congress intends to be a "significant distinction" between ordinary or even negligent violations and willful violations of the FLSA. *McLaughlin*, 486 U.S. at 132. There being no material issue of fact on Plaintiff's claim of a willful violation by Woodland of the FLSA, Plaintiff's Complaint must be dismissed pursuant to the general two year statute of limitations of the FLSA.[9]

## III.  PLAINTIFF'S REQUEST FOR EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS IS WITHOUT MERIT.

Plaintiff seeks equitable tolling of the applicable statute of limitations "for the entire period of Plaintiff's employment." (Ex. A, p. 7, ¶46). Plaintiff's only allegation supporting this claim is

---

[9] If, contrary to Defendants' position, the Court were to find a triable issue of fact on the issue of a willful violation, extending the statute of limitation back an additional year, it would encompass only the time period from February 17, 2013 (three years prior to the filing of the Complaint) to May 3, 2013, when Mr. Palacio received his last paycheck. During the eleven pay periods between these dates, Mr. Palacio worked in excess of 40 hours on three occasions, for a total number of overtime hours of 5.45. (Ex. Kozak Aff. p. 2, ¶9). If a jury determines that Mr. Palacio was entitled to overtime pay, the total amount unpaid and potentially due as damages totals $29.98, based upon his regular rate of pay of $11.00 per hour (50% of $11 = $5.50 x 5.45 overtime hours).

that "Defendants misrepresentations to Plaintiff as to his rights and the failure to post the notice

of rights to which Plaintiff was entitled under the FLSA." *Id.*

**A.  The Purpose of and Standard to be Used in Application of Equitable Tolling.**

The doctrine of equitable tolling is read into every federal statute.  *United States v.*

*$57,960.00 in U.S. Currency*, 58 F.Supp.2d 660, 664 (D.S.C. 1999), citing *Holmberg v.*

*Armbrecht*, 327 U.S. 392, 397 (1946).  This doctrine permits a court to extend the statute of

limitations on a case-by-case basis to prevent inequity.  *Truitt v. County of Wayne*, 148 F.3d 644,

648 (6th Cir. 1998).  Whether the doctrine is to be applied in any particular case is within the sole

discretion of the trial court.  *Id.*  The plaintiff has the burden to demonstrate that he is entitled to

equitable tolling of the relevant statute of limitations.  *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir.

2004).

Federal Courts sparingly apply equitable tolling unless compelling equitable

considerations are present.  In *Graham-Humphreys v. Memphis Brooks Museum of Art*, 209 F.3d

552 (6th Cir. 2000), the Court stated:

> **The federal courts sparingly bestow equitable tolling.** *Irwin v. Department of*
> *Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990);
> *Andrews v. Orr,* 851 F.2d 146, 151 (6th Cir.1988); *Brown v. Mead Corp.,* 646
> F.2d 1163, 1165 (6th Cir.1981). Typically, equitable tolling applies only when a
> litigant's failure to meet a legally-mandated deadline **unavoidably arose from**
> **circumstances beyond that litigant's control.** *See Baldwin County,* 466 U.S. at
> 151, 104 S.Ct. 1723 ("One who fails to act diligently cannot invoke equitable
> principles to excuse that lack of diligence."); *see also Johnson v. United States*
> *Postal Service,* 64 F.3d 233, 238 (6th Cir.1995), which directed that a petitioner's
> failure to satisfy a deadline caused by "garden variety neglect" cannot be excused
> by equitable tolling. (*Citing Irwin,* 498 U.S. at 96, 111 S.Ct. 453). **Absent**
> **compelling equitable considerations, a court should not extend limitations by**
> **even a single day.** *Johnson v. United States Postal Service,* 863 F.2d 48 (Table),
> 1988 WL 122962, at *3 (6th Cir. Nov.16, 1988).

*Id.* at 560 – 561, (emphasis added).

In the context of the FLSA, the vast majority of cases where equitable tolling has been applied involve collective actions and lack of notice to individuals in the potential class.

> In collective wage and employment cases, courts regularly grant equitable tolling so that plaintiffs may assert their claims despite the kinds of delays inherent in such litigation. The logic of this is clear upon considering the fact that the defendant initially is the party in sole possession of the names and last known physical addresses of all potential opt-in Plaintiffs. *See, e.g.*, *Andrews*, 851 F.2d at 146; *White v. Publix Super Markets, Inc.*, No. 3:14–CV–1189, 2015 WL 6510395, at (M.D. Tenn. Oct. 28, 2015); *McLeod v. Just Energy Mktg. Corp.*, 2015 Wage & Hour Cas.2d (BNA) 278029 (N.D. Ohio Aug. 27, 2015); *Bacon v. Subway Sandwiches & Salads, LLC*, No. 3:14–CV–192–PLR–HBG, 2015 WL 1138387, at (E.D. Tenn. Mar. 13, 2015); and *Struck v. PNC Bank N.A.*, 931 F.Supp.2d 842 (S.D. Ohio 2013). Without the possibility of equitable tolling, the value of FLSA collective actions would routinely be diminished to the point of being unfeasible—as the potential recovery for the plaintiff class continuously lessens as cases are delayed. *Cf.*, *Gunn*, 625 Fed.Appx. at 267.

*Penley v. NPC International, Inc.*, 206 F.Supp.3d 1341, 1349 (W.D. Tenn. 2016).[10]

The Sixth Circuit has identified the following six factors to be used in analyzing equitable tolling in any particular case:

1) lack of notice of the filing requirement;
2) lack of constructive knowledge of the filing requirement;
3) diligence in pursuing one's rights;
4) absence of prejudice to the defendant; and
5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement.

*Id.* at 1348, citing *Andrews v. Orr*, 851 F.2d 146, 151 (6th Cir. 1988).

**1. Actual Knowledge.**

Mr. Palacio's first week of work began August 6, 2006.  He left in February 2009 for 32 months and returned to Woodland in October 2011.  He left Woodland again in April 2013.

---

[10] In fact, a Westlaw search of cases within the Sixth Circuit using the search terms "FLSA" and "equitable tolling," but without the search terms "collective" or "class," reveal only three cases during the last three years.  When the search terms collective and class were **not** excluded from the search, 40 cases were revealed during the last three years.

Prior to and during his work for Woodland, Mr. Palacio had actual knowledge that employees may be entitled to overtime pay.

    a.  <u>Prior to August 2006.</u>

Mr. Palacio testified that he arrived in the United States from Cuba in 2003 and immediately went to the State of Michigan.  He testified that his first job was at Venta Furniture where he was a full-time employee, being paid both minimum wage and overtime.  (Ex. F, Palacio dep. p. 12, lines 24 – 25; p. 13, lines 1 – 8).  After approximately a year of employment, he went to work for Grand Rapids Chairs for approximately a year and was paid minimum wage and overtime.  (Ex. F, Palacio dep. p. 13, lines 13 – 24).  In addition, prior to working at Woodland in August 2006, Mr. Palacio acknowledged that he was self-employed, which he described as:

> Q.  Okay. In your own words, what do you mean or understand self-employed to be?
> A.  That you are an independent person. You work independently. You set your own schedule. You come in and leave whenever you wish. That's what I understand it is.

(Ex. F, Palacio dep. p. 15, lines 11 – 15).

    b.  <u>August 2006 to February 2009 at Woodland.</u>

Plaintiff's First Amended Complaint alleges that "after his first pay period" at Woodland in August 2006, he "approached" Defendant's about not being paid overtime.  (Ex. A, p. 6 ¶41).  Although later denied in his deposition (Ex. F, Palacio dep. p. 42, lines 1 – 12), he did testify that he advised Gordon Dean every time "I had to pay my taxes I noticed he wasn't paying me overtime."  (Ex. F, Palacio dep. p. 44, lines 6 – 15).  Mr. Palacio testified:

> Q.  All right, but I do want to confirm. So, you did know when you started at Woodland that the government required employees to be paid time and one-half over 40 hours a week, but you did not understand why Gordon was not paying you that?

25

A. **Exactly.** I mean, when I would ask him why I wasn't being paid overtime he would tell me because you are an independent work. But I would tell him but I'm working for you, I work for you, I don't work for anybody else, so.

(Ex. F, Palacio dep. p. 43, lines 12 – 21).

     c.  <u>February 2009 to October 2011.</u>

When Mr. Palacio left Woodland in February 2009, he immediately filed for unemployment benefits which were denied because he was an independent contractor. (Ex. F, Palacio dep. p. 58, lines 13 – 18). Mr. Palacio applied for and obtained a job at KMG Properties beginning in June 2009. Mr. Palacio worked in maintenance for KMG and was paid minimum wage and overtime. (Ex. F, Palacio dep. p. 57, lines 21 – 24). A few months after working for KMG, Mr. Palacio filed a complaint for sexual harassment against a woman manager. He was represented by attorney Stephen Drew. (Ex. F, Palacio dep. p. 19, lines 15 – 24). In addition, Mr. Palacio was injured on the job at KMG and filed a worker's compensation claim. (Ex. F, Palacio dep. p. 21, lines 8 – 11). Thus, for the 32 months he did not work at Woodland, Mr. Palacio filed for unemployment, filed a civil rights complaint with the assistance of well-known local civil rights attorney and filed a worker's compensation claim. Mr. Palacio well knew how to enforce his rights through governmental agencies .

     d.  <u>October 2011 to April 2013, at Woodland.</u>

In late 2011, Mr. Palacio applied for Social Security Disability benefits. (Ex. F, Palacio dep. p. 76, lines 12 – 16). He also testified that he contacted attorney Robert Alvarez in 2011 or 2012 regarding payment of overtime. (Ex. F, Palacio dep. p. 57, lines 10 – 20).

     e.  <u>After leaving Woodland in April 2013.</u>

On April 29, 2013, **four days before receiving his last paycheck from Woodland** (Ex. K), Mr. Palacio filed a civil rights complaint alleging discrimination, including "full pay of my

wages." (Ex. F, Palacio dep. p. 84, lines 16 – 24; Ex I, Civil Rights Complaint).  In fact, Mr.

Palacio testified that:

> Q. The complaint under unequal wages indicates that Woodland denied you full
> payment of my wages and refused to pay me my full wages for hours worked.
> Were you referring here to both not paying you for all the time you worked
> **and for not paying you overtime?**
> A. Yes.

(Ex. F, Palacio dep. p. 84, line 25; p. 85 line 1 – 5) (emphasis added).  The complaint was

eventually dismissed by the Michigan Department of Civil Rights. (Ex. J).  Sometime prior to

November 2014, Mr. Palacio consulted with his current counsel resulting in a letter from

attorney Marc Asch to Woodland dated November 20, 2014, regarding potential violations of the

FLSA.  (Ex. M).

Mr. Palacio's testimony and conduct fully support the fact that he had actual knowledge

that the government may require payment of overtime compensation for employees working

more than 40 hours per week well before he first worked for Woodland and throughout the

ensuing years.  His conduct in filing claims and complaints with governmental agencies supports

the fact that he had actual if not constructive knowledge of his rights.

As noted, in *Epps-Milton v. Genesee Intermediate School Dist.*, 2014 WL 5817015 No.

14-11861 (E.D. Mich., Nov. 10, 2014), in the context of plaintiff's request to apply the doctrine

of equitable tolling:

> [T]he Court notes that Plaintiff was capable of filing two charges of
> discrimination during the time that the FMLA limitations period was running.
> Because plaintiff was capable of filing charges under VII, there is simply no
> reason to believe that an unsound mind rendered her incapable of filing charge
> related to the FMLA violation.

*Id.* at *11.

### 2.  Constructive Notice.

Black's Law Dictionary (8th Ed. 2004) defines constructive knowledge "as knowledge that one using reasonable care of diligence should have."  There is no question that Mr. Palacio knew the hours he worked (he prepared his own time sheets), his rate of pay and the amount received in payment.  As the Court stated in *Opre v. Milton Township Bd. of Trustees*, No. 04:07-cv-1493, 2007 WL 4350709 (N.D. Ohio, Dec. 7, 2007):

> Assuming that Plaintiff would have had a valid FLSA claim, she had sufficient facts at her disposal to conclude that there may have been a violation and to bring that claim in a timely manner, as is evidenced by the language quoted above from her complaint. **Because Plaintiff had constructive notice of her claim by means of her knowledge of the hours she worked and the pay she received, and because any degree of diligence on her part would have resulted in the realization of those claims based upon the evidence she had, this Court finds that her invocation of the doctrine of equitable tolling is without merit.**

*Id. at *4.* (emphasis added).

### 3.  Diligence in Pursing Rights.

The Supreme Court has stated that, "One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence."  *Baldwin County v. Welcome Center*, 466 U.S. 147, 151, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984).  The Sixth Circuit has concluded that "[I]t is well settled that ignorance of the law alone is not sufficient to warrant equitable tolling." *Graham-Humphries,* 209 F.3d at 561, quoting *Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991) (per curium).

### 4.  Absence of Prejudice to Defendant.

The purposes of statute of limitations is to ensure fairness to defendants by notifying defendants of the claims they must defend before they grow stale. *American Pipe and Construction v. Utah,* 414 U.S. 538, 561, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) (Blackmun, J., concurring) (stating that "the purpose of the statute of limitations is to prevent surprises `through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared'") (quoting *Order of Railroad Telegraphers v.*

28

> *Railway Express Agency,* 321 U.S. 342, 348-49, 64 S.Ct. 582, 88 L.Ed. 788
> (1944)).

*Baden-Winterwood v. Life Time Fitness*, 484 F.Supp.2d 822, 829 (S.D. Ohio, 2007).

### 5. Plaintiff's Reasonableness in Remaining Ignorant of the Filing Requirement.

"Ignorance of the law alone is not sufficient to warrant equitable tolling."  *Rose*, 945 F.3d at 1335.  Further, "[T]o allow an ignorance of the law excuse would encourage and award indifference to the law.  *United States v. Baker*, 197 F.3d 211, 218 (6th Cir. 1999).  Mr. Palacio's employment history and testimony do not support either the fact of any claimed "ignorance" let alone the reasonableness of the claim.

It appears that one of Mr. Palacio's principal arguments for equitable tolling is the alleged failure of Woodland to post employee notice of rights in the workplace.  (Ex. A, p. 7, ¶46).  Gordon Dean testified that the "employee right signs were placed in the breakroom where Mr. Palacio not only had access but everyone was "in and out of that room on a regular basis." (Ex. C, Dean dep. p. 74, lines 9 – 21).  While Mr. Palacio testified that he did not see any signs advising of employee rights (Ex. F, Palacio dep. p. 57, lines 3 – 8), the issue of whether or not an employee rights sign was posted is not material to a claim of equitable tolling unless a plaintiff can demonstrate that he had no other source from which he could receive notice of his rights.  As the Court in *Matysiak v. Shamas*, No. 3:10-cv-01841, 2015 WL 4939793 (D.C. Conn.,  2015), stated:

> Accepting Matysiak's statement as true, it does not support application of the equitable tolling doctrine. **Failure to post required wage-and-hour notices is insufficient to toll the FLSA statute of limitations.** ***See Upadhyay v. Sethi,* 848 F. Supp. 2d 439, 445 (S.D.N.Y. 2012) (holding that failure to post required FLSA notices ''is not by itself sufficient to Warrant equitable tolling; plaintiff must also show that she had not received notice of her rights through any other avenue'').** Matysiak has not cited any Connecticut case establishing a more stringent rule under the CMWA. From Matysiak's own assertions, it is clear that

29

he believed he was being underpaid the entire time that he worked for defendants. He says that he "repeatedly" asked defendant Shamas to pay him the prevailing wage. **He therefore knew the facts that could support his claim, even if he did not know that he had a cause of action under the FLSA** or Connecticut law. *Gustafson v. Bell Atl. Corp.,* 171 F. Supp. 2d 311, 323 (S.D.N.Y. 2001) (declining to apply equitable tolling because it was "clear that plaintiff knew the facts that would comprise a cause of action under either the FLSA or New York law (that he was receiving straight pay for overtime) even if he did not know that he had a legal claim under those statutes.").

*Id.* at *5 – 6 (emphasis added).

"Equitable Tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs."  *Wallace v. Kato*, 549 U.S. 384, 396, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007).  There are no material issues of fact which support **any** of the factors a court may consider in exercising its discretion to allow equitable tolling of the statute of limitations.

## IV.  WOODLAND IS NOT AN ENTERPRISE UNDER THE FLSA AND NEITHER WOODLAND NOR PLAINTIFF WAS ENGAGED IN INTERSTATE COMMERCE.

The Fair Labor Standards Act provides:

Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess above specified at a rate not less than one and one-half times the regular rate at of the hours he is employed.

29 U.S.C. §207(1).

The FLSA provides protection to employees in one of two ways:  "First, employees may be employed in an enterprise engaged in commerce or in the production of goods for commerce and thus enjoy 'enterprise coverage.'"  *Kowalski v. Kowalski Heat Treating Co.*, 920 F.Supp.

799, 802 – 803 (N.D. Ohio 1996).  Second, an employee may be protected by the FLSA if the "employees may themselves be engaged in commerce or in the production of goods for commerce, enjoying 'individual coverage.'" *Id.* at 803.

## A.  Woodland is not an Enterprise as Defined in the FLSA.

Under the FLSA an "enterprise engaged in commerce" has (1) "employees" who are "engaged in commerce or in the production of goods for commerce, or…employees handling, selling, or otherwise working on goods or materials that have moved in or produced for commerce by any person" **and** (2) gross annual revenue of at least $500,000.   29 U.S.C. §203(s)(1)(A).

Between August 2006 and April 2016, when Woodland ceased operations, Woodland never had gross annual revenues of $500,000 or more.  (Ex. B, Vander Ark dep. p. 76, lines 16 – 23; Ex. E, Kozak Aff. p. 2, ¶4).  Consequently, there is no "enterprise coverage" for Plaintiff under FLSA.

## B.  Plaintiff did not Individually Engage in Commerce.

Since Plaintiff cannot take advantage of "enterprise coverage" of the FLSA, he must sustain his burden to demonstrate that he engaged in commerce or the production of goods for commerce regardless of whether Woodland was a business engaged in interstate commerce. Woodland does not have any burden to demonstrate that it **does not** engage in interstate commerce.   It is the Plaintiff who has the burden of proving "individual coverage" by demonstrating that the employee "[himself] [is] engaged in commerce or in the production of goods for commerce…"   *Kowalski*, 920 F.Supp. at 803.   It is axiomatic, however, that if Woodland did not engage in interstate commerce or the production of goods for commerce,

demonstrating that a regular and recurring part of Mr. Palacio's work, duties and responsibilities involved interstate commerce is difficult, if not impossible.

The FLSA defines commerce as "trade, commerce, transportation, transmission or communication among the several states or between any State and any place outside thereof." 29 U.S.C. §203(b). "Commerce" under the FLSA "must be interstate commerce, and not all of the activities subject to the constitutional power of Congress over interstate commerce come within the scope of the Act." *Mitchell v. Welcome Wagon, Inc.*, 139 F.Supp. 674, 678 (W.D. Tenn. 1954). Plaintiff has the burden to prove "that Defendant's employees are engaged in commerce or in the production of goods for commerce." *Id.* The test under the FLSA as to whether an employee engages in commerce "is not whether the employee's activities affect or indirectly relate to interstate commerce, **but whether they are in or so closely related to the movement of the commerce as to be a part of it.**" *McLeod v. Threlkeld*, 319 U.S. 491, 497, 63 S.Ct. 1248 87 L.Ed. 1538 (1943) (emphasis added). "Plaintiff must establish that [defendant's] employees spend a substantial portion of their time engaging in interstate commerce…" *Mitchell v. Welcome Wagon, Inc.*, 139 F.Supp. 674, 678 (W.D. Tenn. 1954), citing *Hunter v. Madison Ave. Corp.*, 174 F.2d 164, 167 (6th Cir. 1949). As recently articulated by the Eleventh Circuit, for an employee to "engaged in commerce," he "must be directly participating in the actual movant of persons or things in interstate commerce by (i) working for an instrumentality of interstate commerce, e.g., transportation or communication industry employees or [ii] by regularly using the instrumentalities of interstate commerce in his work, e.g., regular and recurrent use of interstate telephone, telegraph, mails, or travel." *Thorne v. All Restoration Services, Inc.*, 448 F.3d 1264, 1266 (11th Cir. 2006).

32

### 1. Woodland Did Not Engage in Interstate Commerce.

Woodland's business did not involve or relate to "the **movement** of persons or things in interstate commerce." *Thorne*, 448 F.3d at 1266 (emphasis added).

Woodland was in the rental business. It did not rent tools, equipment, merchandise or goods of any description. Woodland only rented time on two indoor sports fields. For the years Woodland was in business, 99.3% of Woodland's gross revenue was from "field rental." (Ex. Kozak Aff. ¶5). Woodland's customers were local individuals, sports clubs, high schools, colleges, and hobby enthusiasts. (Ex. C, Dean dep. p. 76, lines 12 – 22). The indoor facilities were occasionally rented to local residents for special events such as quinceañeras and religious events. To the best of Gordon Dean's recollection, Woodland never rented time to an out-of-state team or club. (Ex. C, Dean dep. p. 76, lines 12 – 22).

For very short periods of time, Woodland allowed a few of its independent contractors to sell coffee and candy/snacks on their own time and expense. (Ex. C, Dean dep. p. 26, lines 2 – 25, p. 27, lines 1 – 4, p. 30, lines 12 – 25, p. 31, lines 1 – 17). Mr. Dean at one time had available tennis shoes for customers who may have forgotten their own. (Ex. C, Dean dep. p. 31, lines 20 – 25, p. 32, lines 1 – 25). For a short period of time, Woodland did have vending machines for use by their customers to purchase water and sports drinks.[11]

Woodland did purchase "goods" for use in the business. As part of the renovation, Woodland purchased artificial turf for the two fields from a business in Illinois. (Ex. C, Dean dep. p. 72, lines 6 – 14).

---

[11] Under most circumstances, the placement or stocking of a vending machine in an business establishment does not implicate interstate commerce for the establishment whose customers may purchase the product. See generally, *Walling v. Sanders*, 136 F.2d 78 (6th Cir. 1943).

Goods, the production or handling of which are covered by the FLSA, are defined as:

(i)     "Goods" means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, **but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof.**

29 U.S.C. §203(i) (emphasis added).  Woodland purchased supplies necessary for maintenance as an "ultimate consumer."  Woodland was the ultimate consumer of the artificial turf.  Other maintenance supplies or materials were all purchased locally from retail outlets such as Lowes, Gordon Foods, Costco or other local businesses.  (Ex. C, Dean dep. p. 66, lines 22 – 25; p. 67, lines 1 – 5).  The business itself is an end-user of the goods if the business does not otherwise engage in moving these goods further in the stream of commerce.

§ 779.251  Goods that have Lost Their Out-of-State Identity.

**(a)  Goods which are purchased or received by the enterprise within the State will not be considered goods which have "moved across State lines" if the goods, although they came from outside the State, had been processed or manufactured so as to have lost their identity as out-of-State goods before they are purchased or received by the enterprise.**  This assumes, of course, that the goods so manufactured or processed do not move across State lines before they are sold by the enterprise.  Thus where an enterprise buys bread basked within the State which does not move across State lines before it is resold by the enterprise, the bread is not "goods, which have moved across State lines eve if the flour and other ingredients came from outside the State.  The same conclusion will follow, under the same circumstances, where clothing is manufactured from out-of-State fabrics.

29 C.F.R. §779.251 (emphasis added).

Woodland was the end-user of goods necessary for maintenance of the building.  It did not sell, manufacturer, alter, or enhance any goods which were then placed back in the stream of commerce to an ultimate consumer.

**2.  Plaintiff Did Not Engage in Interstate Commerce.**

Mr. Palacio testified that his general duties and responsibilities while working at Woodland included:

1. Floor care, including sweeping mopping, and painting as needed,
2. Moving furniture and equipment as needed;
3. Repairing and installing drywall and paint as needed;
4. Caring for the turf fields, such as picking up trash, sweeping and running a golf cart;
5. Repairing field lights and nets;
6. Maintaining the outside of the building, such as picking up trash, sweeping and snow removal;
7. Cleaning windows and glass doors;
8. Removing and installing carpeting and general maintenance work, such as hanging doors;
9. Purchasing cleaning material and supplies from local stores; and
10. Cleaning bathrooms.

(Ex. F, Palacio dep. p. 61, lines 23 – 25; p. 62, lines 1 – 25; p. 63, lines 7 – 10).

Mr. Palacio also testified that on occasion he would schedule a field for rental, accept money for rental, answer the phone to speak with Spanish speaking customers, and sell things to customers such as shoes, socks, etc…  (Ex. F, Palacio dep. p. 63, lines 11 – 25; p. 64, lines 4 – 19; p. 65, lines 12 – 25; p. 66, lines 1 – 2; p. 67, lines 20 – 25).  Mr. Palacio could not identify the frequency with which these occasional tasks were performed, other than basically when "he [Gordon Dean] didn't have anyone else to do it."  (Ex. F, Palacio dep. p. 66, lines 3 – 10).

Mr. Palacio as well as Mr. Dean both testified as to tasks or jobs he **did not** perform.  Mr. Palacio's duties did not include opening the mail, paying invoices, traveling out of the state or ordering supplies.  (Ex. F, Palacio dep. p. 64, lines 2 – 3 and 20 – 25; Ex. C, Dean dep. p. 75, lines 25; p. 76, lines 1 – 2).

Mr. Palacio testified that he had his own tools as did Woodland. (Ex. F, Palacio dep. p. 67, lines 12 – 19).  Mr. Palacio may claim that he was somehow engaged in interstate commerce because in the course of performing maintenance at Woodland he provided or used tools necessary for maintenance, such as cleaning supplies, brooms, or other products generally used in building maintenance.  The purchase of cleaning products or materials used in cleaning when purchased from local establishments does not trigger the handling of goods or merchandise in

35

interstate commerce. *Collado v. Florida Cleanex, Inc.*, 727 F.Supp.2d 1369, 1374 (2010) (undisputed evidence that cleaning products were purchased locally and not from out of state). In *Jacoby v. Schimka Auto Wreckers, Inc.*, No. 10-C-1452, 2010 WL 3171515 (N.D. Ill. Aug. 11, 2010), an employee argued for individual coverage under the FLSA because in his job of towing vehicles locally, he was required to handle tools "such as chains, jumper cables and wrenches, that likely moved in interstate commerce before being used by the plaintiff." The Court concluded that plaintiff's performance of his duties had little effect on interstate commerce except tangential use of tools that may have traveled in interstate commerce" and that such work activity fell under the category of isolated activity. *Id.* at *3.

In *Thorne v. All Restoration Services, Inc.*, 448 F.3d 1264 (11th Cir. 2006), the plaintiff claimed individual coverage in part because he purchased and used tools for the employer from a local Home Depot. The Court denied the plaintiff individual coverage under the FLSA, stating:

> Moreover, the fact that some of the tools he purchased may have crossed state lines at a previous time does not in itself implicate interstate commerce. When goods reach the customer for whom they were intended, the interstate journey ends and employees engaged in any further intrastate movement of the goods are not covered under the Act. *McLeod*, 391 U.S. at 493, 63 S.Ct. 1248. Courts distinguish between merchants who bring commerce across State lines for sale and the ultimate consumer, who merely purchases goods that previously moved in interstate commerce for intrastate use. Therefore, a customer who purchases an item from Home Depot is not engaged in commerce even if Home Depot previously purchased it from out-of-state wholesalers.

*Id.* at 1267. After finding further support in the case of *Dunlap v. Industrial America Corporation*, 516 F.2d 498, 499 (5th Cir. 1975) where the Court rejected a claim that the use of gasoline and oil products in its wholly local garbage collection business constitutes a tie to interstate commerce, the *Thorne* Court concluded:

> Similar to the defendant in *Dunlop*, ARS operates exclusively within the state of Florida, and its customers are located in state.  Under the precedent of *Dunlop*, ARS's activities were not rendered interstate commerce simply because ARS, an ultimate consumer, purchased goods which had previously moved in interstate commerce.  Accordingly, the Court finds that Thome did not produce sufficient evidence that he engaged in interstate commerce to overcome Defendants' Rule 56 motion.

*Id.* at 1268.  Similarly, in *Daroski v. Wojewoda*, No. 3:15-cv-00803, 2016 WL 4178840 (D.C. Conn. Aug. 7, 2016), Plaintiff, who cared for and groomed horses for his employer claimed individual coverage partially on the basis that feed and tools used were shipped from out-of-state.  The Court rejected this argument concluding:

> Darowski argues that he qualifies for individual coverage under the FLSA for three reasons. First, he states that he "engaged in commerce" by feeding the horses with "feed [that is] most likely shipped directly from the Midwest." (ECF No. 25 at 7.) **While the Court cannot consider evidence outside the pleadings at this stage, it may reasonably infer from the Complaint that Darowski used tools and supplies that had traveled in interstate commerce.** *E.G., Archie v. Grand Cent. P'ship, Inc.,* 997 F. Supp. 504, 530 (S.D. N.Y. 1998) ("[The plaintiffs] used a number of items—bags, brooms, shovels, pails, scrapers[,] radios[,] books[, and] flashlights . . . some of which undoubtedly moved in interstate commerce."). Even if the Court makes this inference, however, **Darowski merely used items that were shipped from another state. An employee who uses items that have traveled across state lines is not "an employee engaged in commerce."** *See McLeod,* 319 U.S. at 494 ("[E]mployees who handle goods after acquisition by a merchant for general local disposition are not [engaged in commerce].");  *Reagor v. Okmulgee Cty. Family Res. Ctr.,* 501 F. App'x 805, 810 (10th Cir. 2012) (holding that an employee was not "engaged in commerce" when she handled goods that had traveled in interstate commerce);  *Thorne v. All Restoration Servs., Inc.,* 448 F.3d 1264, 1267 (11th Cir. 2006) (holding that an employee was not "engaged in commerce" when he purchased tools for his job that may have crossed state lines). **Here, Darowski did not "engage in commerce" simply by using tools and supplies that were shipped from another state.**

*Id.* at. *7.

Defendants' counsel could not locate a case specifically involving claimed "individual coverage" under the FLSA for a business whose principal operation involved the rental of time on indoor sports fields.  However, in the case of *Shoemaker v. Lake Arbutus Pavilion, LLC*, 115

F.Supp.3d 974 (W.D. WI 2015), the defendant owned and operated a roller rink where time and skates were rented and a restaurant was operated. The plaintiff employees alleged a violation of the FLSA for failure to pay overtime. The issue before the Court was whether the individual employees engaged in interstate commerce. After determining that "enterprise" coverage did not apply because the business did not have gross annual revenues of $500,000 or more, the Court set forth the standard for individual coverage under the FLSA:

> The FLSA applies to those who are *engaged* in commerce; it is not enough to show that the employee's activities *affected* commerce. *Mitchell v. Lublin, McGaughy & Assoc.,* 358 U.S. 207, 211, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959) (citing *McLeod v. Threlkeld,* 319 U.S. 491, 494, 63 S.Ct. 1248, 87 L.Ed. 1538 (1943)). For an employee to "engage in commerce" himself, his work must be "so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity." *Mitchell v. C.W. Vollmer & Co.,* 349 U.S. 427, 429, 75 S.Ct. 860, 99 L.Ed. 1196 (1955) (citations omitted). This is a practical inquiry that focuses on the specific activities of the employee and what kind of effect those activities might have on interstate commerce. *Id.* For example:
>
>> One practical question to be asked is whether, without the particular service, interstate or foreign commerce would be impeded, impaired, or abated; others are whether the service contributes materially to the consummation of transactions in interstate or foreign commerce or makes it possible for existing instrumentalities of commerce to accomplish the movement of such commerce effectively and to free it from burdens or obstructions.
>
> 29 C.F.R. § 776.9. If the employee's activities fall below this level of engagement with interstate commerce, then the activities are considered to be more local in nature and the employee falls outside of FLSA coverage.

*Id.* at 979. The plaintiff claimed individual interstate coverage based upon the following:

1. The roller rink and restaurant served out-of-state patrons;
2. They performed work using interstate mail, telephone, and the internet;
3. They used Facebook, credit cards, cell phone texting, and a fax machine.

*Id.* at 979 – 980. The Court focused on the requirement that such alleged interstate activity must be "regular and recurring." The Court concluded:

38

> But even if the court were to overlook the inconsistencies and credit the
> Shoemakers' assertions that they used credit cards, credit card machines, a fax
> machine, and even company telephones to complete transactions and
> communicate, the Shoemakers have not adduced evidence to suggest that these
> activities were regular and recurring or that they went across state lines. The
> Shoemakers have failed to meet their burden of demonstrating sufficient
> engagement with interstate commerce to bring them within the reach of the
> FLSA. Instead, the undisputed facts show that the Shoemakers worked for a local
> business in an intrastate capacity. Because the Shoemakers have failed to raise a
> genuine dispute of a material fact as to whether they are covered by the FLSA, the
> court will grant LAP's motion for summary judgment on the FLSA claim.

*Id.* at 980 – 981.

Woodland was not engaged in the movement of goods which "regularly are produced for commerce or from which such goods are regularly shipped in interstate commerce." 29 C.F.R. § 779.116 (custodial maintenance employees performing work on machinery, equipment or the premises for entities producing or shipping goods in commerce may be engaged in covered activities). Based upon "the undisputed facts" Mr. Palacio "worked for a local business in an intrastate capacity." *Shoemaker,* 115 F.Supp.3d at 981.

Finally, the Sixth Circuit has adopted and applied a rule of *de minimus* when inconsequential incidents of interstate commerce may occur. In *Hunter v. Madison Ave. Corp.*, 174 F.2d 164 (6th Cir. 1949), the Court addressed the issue of FLSA coverage for maintenance employees of the owner of a twenty nine story office building in Memphis, Tennessee. The owner's sole business was rental of office space. It was acknowledged that a large percentage of the tenants were engaged in some form of interstate commerce. Despite having tenant/customers who may be engaged in interstate commerce, the Court concluded that there was no FLSA coverage for the employees of the building owner, stating:

> "That an office building exclusively devoted to the purpose of housing all the
> usual miscellany of offices has many differences in the practical affairs of life
> from a manufacturing building or the office building of a manufacturer and the
> differences are too important in the setting of the Fair Labor Standards Act not to

> be recognized by the Courts" the holding of the Court that the business
> maintenance employees of the building in question were not covered by the Act
> controls our decision in this case.

*Id.* at 167 (quoting *#10 East 40th Street Building v. Callus*, 325 U.S. 578, 65 S.Ct. 1227, 1229, 89

L.Ed. 1806 (1845).  The plaintiffs in *Hunter* also contended that the employer was engaged in

the production of goods for commerce because waste paper gathered by the cleaning operations

was sold to a waste paper dealer, some of which was thereafter processed into roofing felt which

went into the stream of commerce.  The *Hunter* Court concluded that the potential for waste

moving in a stream of commerce was too many steps removed from defendant's rental business

and concluded that:

> Were some inconsequential incident of interstate commerce happens to result
> from the general conduct of a fundamentally in-trust-state business, the rule of *de*
> *minimus* is applicable and the Act shall not apply.  Hill v Jones, D.C., 59 F.Supp.
> 569 (_____).

*Id*.

## V.   PLAINTIFF HAS FAILED TO STATE OR SUPPORT A CLAIM OF RETALIATION UNDER THE FLSA

Plaintiff's First Amended Complaint alleges retaliation under the FLSA (Ex. A, pp. 8 –

9).  If all of Plaintiff's federal claims are not dismissed based upon the statute of limitations or

the failure to demonstrate individual interstate commerce coverage, Plaintiff's retaliation claim

must be dismissed.

The FLSA makes it unlawful for an employer to discharge an employee for filing a

complaint, instituting a proceeding or testifying in a proceeding under or related to the FLSA.  29

U.S.C. §215(a)(3):

> To establish a prima facie case of retaliation, an employee must prove that (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known to the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a casual connection between the protected activity and the adverse employment action." *Adair v Charter County of Wayne*, 452 F.3d 482, 489 (citing *Williams v Gen. Motor Corp.*, 187 F.3d 553, 568 (6th Cir. 1999)).

To trigger the retaliation provisions of the FLSA, the Supreme Court has stated that "a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14, 131 S.Ct. 1325, 179 L.Ed.2d 379 (2011). The Court further stated:

> [t]he phrase "filed any complaint" contemplates some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns.

*Id.* The complaint must be of such a nature that "a reasonable, objective person would have understood the employee to have put the employer on notice that the employee is asserting statutory rights under the Act." *Kasten,* 563 U.S. at 14.

The factual allegations supporting Plaintiff's claim of retaliation focus on alleged conversations/threats made by Mr. Vander Ark that he had "spoken with the Social Security Administration" and was "told Plaintiff could not work over forty (40) hours per work week." (Ex. A, p. 8, ¶63). Allegedly, Defendant Vander Ark further "told Plaintiff that he could get in trouble if it was discovered by the Social Security Administration that he was working overtime." (Ex. A, p. 8, ¶63). Plaintiff testified that he applied for Social Security Disability for paranoia and bipolar condition sometime in the fall of 2011. (Ex. F, Palacio dep. p. 76, lines 9 – 11).

41

Mr. Palacio never had a substantive conversation with Mr. Vander Ark.  (Ex. F, Palacio dep. p. 51, lines 12 – 17).  With regard to what may have been said by Mr. Dean, Mr. Palacio testified:

> Q.  Did Gordon Dean ever threaten to call Social Security and report to them that you were making more than the amount allowed?
> A.  **No, that never happened** because he never pay me more than what the limit was. That was not an issue.

(Ex. F, Palacio dep. p. 84, lines 1 – 5) (emphasis added).

Plaintiff never filed a written complaint regarding payment of overtime at any time while working for Woodland.  The only formal complaint he ever made against Woodland was a complaint for civil right violations made to the Michigan Department of Civil Rights immediately **after leaving Woodland**.  (Ex. F, Palacio dep. p. 84, lines 16 – 25; p. 85, lines 12 – 25).  With regard to any "internal complaint," about not paying overtime, the Plaintiff testified:

> Q.  After you began work at Woodland in August of 2006, did you complain to anyone at Woodland about not being paid overtime?
> A.  No.

(Ex. F, Palacio dep. p. 42, lines 13 – 16).

Not only did the alleged conversations/threats not occur, the Plaintiff further testified that Gordon Dean, manager of Woodland, encouraged him to seek Social Security Disability and only spoke with a Social Security representative when Plaintiff asked him to.

> Q. How do you know that Gordon called?
> A. Because he did it in front of me. And I had been to Social Security, the Social Security office already, because Gordon had send me there to find that out. So, when I came back to Woodland from the Social Security office I brought with me a telephone number. I provided that telephone number to Gordon. He called and they explained to him that the first year I could work and there would be no problem whatsoever, and they told him also that starting the second year I did have to report the work that I was doing and they told him what was the maximum amount of money that I could make and so on.

42

Q. So, you were present -- well, strike that. You provided a phone number to Gordon Dean at Woodland, and while you were present Mr. Dean called the Social Security office?
A. Yes. I went to the Social Security with my payee…

(Ex. F, Palacio dep. p. 78, lines 6 – 23).

Even if there were sufficient facts to support that an actual complaint was filed by the Plaintiff and somehow Woodland used that information to threaten him, there is absolutely no evidence of Woodland's taking any adverse employment action or there being a causal connection between the "complaint and such action."  Mr. Palacio testified that virtually from the beginning of his work at Woodland (August 2006) he had complained about failure to pay for all the hours he "worked."  After this alleged "threat" sometime in late 2011, nothing changed – Mr. continued to believe that he was being "docked" time.  (Ex. C, Dean dep. p. 13, lines 17 – 25; p. 14, lines 1 – 3).

The only "adverse action" that Mr. Palacio referenced in the context of his getting Social Security Disability was being "manipulated" by Mr. Dean regarding cleaning bathrooms:

No, I think the reason why he didn't pay me for the overtime or the number of hours that I worked was because he knew I was on this disability program and he was aware that I did not remember things. And many times he manipulated me. I think he used the fact that I didn't have a good memory. Yeah, I mean, one way, for instance, just to illustrate the way he manipulated me, the issue that I mentioned earlier about the cleaning of the bathrooms. He would have me clean the bathrooms, but he would mention that he was going to hire a company to take care of that job and nobody came. He would keep telling me he had somebody that was going to come, but nobody came for two years. So, he was utilizing me, he was manipulating me in that way.

(Ex. F, Palacio dep. p. 81, line 25; p. 82, lines 1 – 14).  This could hardly be adverse employment action when part of his maintenance/janitorial duties from the beginning were to clean bathrooms!  (Ex. F, Palacio dep. p. 63, lines 7 – 10).

Plaintiff cannot present material issues of fact to support any claim of retaliation under the FLSA.

## VI. DEPENDING ON THE COURT'S RULING ON OTHER ISSUES, PLAINTIFF'S STATE LAW CLAIMS SHOULD BE DISMISSED WITH OR WITHOUT PREJUDICE.

Plaintiff's First Amended Complaint alleges violation of the Michigan Workforce Opportunity Wage Act (Count III) and the Bullard-Plawecki Employee Right to Know Act (Count IV).  While the Court has original jurisdiction over Plaintiff's claim under the FLSA, pursuant to 28 U.S.C. §1331, the Court has discretion to exercise supplemental jurisdiction over accompanying state law claims.  28 U.S.C. §1367; *Smith v. Erie County Sheriff's Dept.*, 603 F.3d 414, 424 (6th Cir. 2015).  As stated *Habich v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir. 2003), "supplemental jurisdiction is a doctrine of discretion, not of plaintiff's right."  In the event this Court dismisses Plaintiff's claims under the FLSA, Defendants request that this Court exercise the general rule declining the exercise of supplemental jurisdiction over plaintiff's state-law claims.  See, 28 U.S.C. §1367(c)(3); *Brown v. Cassens Transportation Co.*, 546 F.3d 347, 363 (6th Cir. 2008); see also, *Shaver v. Brimfield Twp.*, 628 F.App'x 378, 384 (6th Cir. 2015).

In the event this Court were to deny Plaintiff's Motion to dismiss Plaintiff's claims under the FLSA and were to determine "as a matter of law" that the FLSA applies to Woodland, Plaintiff's claims for overtime compensation under the Michigan Workforce Opportunity Wage Act must be dismissed.  A determination or stipulation that the FLSA applies to an employee's claim for overtime precludes claims for overtime under the Michigan Workforce Opportunity Wage Act.  M.C.L. 408.420(1)(a); M.C.L. 408.414(a); *Arlington v. Michigan Bell Telephone Co.*, 746 F.Supp.2d 854, 857-859 (E.D. Mich. 2010); see also, *Pacheco v. Boar's Head*

*Provisions Co. Inc.*, No. 09-398, 2010 WL 1323785, at \*3 – 4 (W.D. Mich. March 30, 2010); and *Morrison v. Staples, Inc.*, No. 08-616, 2008 WL 4911156, at \*3 (D. Conn. Nov. 13, 2008).

<u>CONCLUSION</u>

Plaintiff's Complaint was filed more than two years after his claim accrued under the FLSA.  Plaintiff cannot support his claim that Woodland engaged in a willful violation of the FLSA to extend the statute of limitations to three years, and Plaintiff's Complaint must be dismissed for failure to bring his federal claims within the statute of limitation.  Plaintiff cannot sustain his burden to demonstrate that the statute of limitations should be equitably tolled.  In the alternative, there are no triable issues of fact which would sustain Plaintiff's burden of proving either "enterprise" or "individual" coverage of Plaintiff's claims under the FLSA.  Consequently, Plaintiff's federal claims must be dismissed.  If not other otherwise dismissed, at a minimum, Plaintiff's claim of retaliation under the FLSA is not supported by triable issues of fact so it must be dismissed.  In the event Plaintiff's federal claims are dismissed, the Court should decline to retain supplemental jurisdiction over Plaintiff's state claims and those claims should be dismissed without prejudice.

RESPECTFULLY SUBMITTED,

By: <u>/s/ Steven J. Vander Ark (P32471)</u>
     Attorney for Defendants
     29 Pearl Street NW, Ste. 145
     Grand Rapids, MI  49503
     (616) 454-6500
     steve.vanderark@gmail.com